**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Starmark Laboratories<br><br>**Plaintiff,**<br><br>**v.**<br><br>Creative Compounds, Inc.<br><br>**Defendant.** | : | **Civil Action No.:** |

**COMPLAINT**

Plaintiff, Starmark Laboratories ("Starmark"), comes before this Court by way of Complaint against defendant, Creative Compounds, Inc. ("Creative") and alleges and states:

I. JURISDICTION AND VENUE

1. This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. This is also an action for unfair competition arising under the Lanham Act of the United States, Title 15 of the United States Code.

2. Jurisdiction in this Court is conferred pursuant to 28 U.S.C. § 1336(a).

3. Venue is conferred in this judicial district pursuant to 28 U.S.C. § 1391(c) and 28 U.S.C. § 1400(b).

II. THE PARTIES

4. Plaintiff, Starmark, is a corporation organized and existing under the laws of the

State of Oregon, having its principal place of business at 11047 NW 122ND Street, Medley, FL 33176.

5. Defendant Creative Compounds is a corporation organized and existing under the laws of the State of Nevada, having its principal place of business at 2230 Main Street, Scott City MO 63780 and is subject to personal jurisdiction within this judicial district.

6. On information and belief, Creative Compounds is qualified to do business in Pennsylvania pursuant to the laws of the Commonwealth of Pennsylvania, and has and is doing such business in Pennsylvania and in this district.

7. Starmark and the defendant are competitors.

## III. THE FACTS

8. Starmark is the owner by assignment of all right, title and interest in and to United States Letters Patent No. 7,109,373 issued to Starmark, entitled “Creatine Salts and Method of Making Same.” (hereinafter referred to as the “Starmark patent”). A copy of the Starmark patent is attached hereto as Exhibit A.

9. The Starmark patent was duly and legally issued and is valid.

10. The Starmark patent relates to dietary supplements known as Creatine Salts.

11. Creatine is a dietary supplement used in athletic training and other endeavors. Creatine is difficult to efficiently absorb in the body. Therefore, producing a supplement that increases the absorption efficiency by the body of creatine has been a desired goal in the supplement industry.

12. The Starmark patent defines various Creatine Salts, including one known as

Dicreatine Malate, which are intended to provide a more efficient absorption rate by the body than might otherwise occur.

13. Upon information and belief, rather then compete fairly with Starmark, and fairly attempt to engineer its own Creatine compounds, the defendant decided to: 1) infringe Starmark's patent; 2) file its own patent application for Dicreatine Malate; and 3) disparage Starmark's Patent with false statements about the Starmark patent, as well as false statements about Creative's rights to use Dicreatine Malate.

14. Creative has been and is now making and selling a Dicreatine Compound known as 2CM.

15. 2CM is sold in this judicial district and throughout the United States.

16. 2CM infringes the Starmark patent.

17. 2CM is made and has been made according to the teachings of the Starmark patent.

18. The making and selling of 2CM in this judicial district and elsewhere in the United States constitutes direct and contributory infringement by Creative of the Starmark patent, in violation of 35 U.S.C. § 271.

19. The making and selling of 2CM in this judicial district and elsewhere in the United States constitutes active inducement by Creative to infringe the Starmark patent, in violation of 35 U.S.C. § 271.

20. Creative's active and contributory infringement of the Starmark patent and Creative's active inducement to infringe the Starmark patent has been without license from Starmark and in violation of Starmark's patent rights, and it is

believed that Creative will continue to infringe Starmark's patent rights unless enjoined by this Court.

21. Upon information and belief, Creative's acts of infringement have been willful and deliberate, with full knowledge of Starmark's rights in the Starmark patent and the Starmark Technology.

22. As a result of Creative's active and contributory infringement of the Starmark patent and Creative's active inducement to infringe, Starmark has been damaged and will continue to be damaged in an amount to be determined at trial.

23. Starmark has suffered and will continue to suffer irreparable injury unless the infringing activities of Creative are enjoined.

24. By virtue of Creative's willful and deliberate infringement, this is an "exceptional case" within the meaning of 35 U.S.C. § 285.

25. Creative has falsely advertised, as well as falsely published information about 2CM and Starmark's rights to Dicreatine Malate.

26. For example, Creative has falsely claimed that it is the inventor of Dicreatine Malate and that it had invented Dicreatine Malate before Starmark. (Exhibit B; Exhibit C.)

27. For example, Creative has filed a patent application before the United States Patent and Trademark Office falsely claiming that it is the first and sole inventor of Dicreatine Malate.

28. For example, Creative has failed to disclose to the United States Patent and Trademark Office, in violation of its duty of disclosure before that Office, that the Starmark patent exists and has superior rights to Dicreatine Malate.

29. For example, Creative has falsely notified other, possible licensees of the Starmark patent that it has rights to Dicreatine Malate. (See, e.g., Exhibit C; Exhibit D.)

30. Creative's 2CM is only possible because it is made according to the teachings of the Starmark patent, infringes the Starmark patent, copies and has been promoted by Creative using false and disparaging statements about Starmark's patent.

31. On information and belief the defendant's false statements are being promulgated in an attempt to disparage Starmark's patent in an unlawful attempt to harm Starmark competitively.

32. On information and belief the defendant's false statements are knowingly incorrect, and defendant intended that others would rely upon those false statements in making those false statements.

33. On information and belief the defendant made these representations knowing they are false, and intended that the statements be acted on to the detriment of Starmark.

<u>COUNT I – Patent Infringement</u>

34. Starmark incorporates herein the allegations of Paragraphs 1 through 33 as if fully set forth at length.

35. 2CM is sold in this judicial district and made and sold throughout the United States.

36. 2CM infringes the Starmark patent.

37. The making and selling of 2CM in this judicial district and elsewhere in the United States constitutes direct and contributory infringement by the defendant of,

and active inducement by the defendant to, infringe the Starmark patent, all in violation of 35 U.S.C. § 271.

38. Defendant's infringement of the Starmark patent has been without license from Starmark and in violation of Starmark's patent rights, and it is believed that the defendant will continue to infringe Starmark's patent rights unless enjoined by this Court.

39. Upon information and belief, defendant's acts of infringement have been willful and deliberate, with full knowledge of Starmark's rights in the Starmark patent.

40. As a result of defendant's infringement of the Starmark patent, Starmark has been damaged and will continue to be damaged in an amount to be determined at trial.

41. Starmark has suffered and will continue to suffer irreparable injury unless the infringing activities of defendant is enjoined.

42. By virtue of defendant's willful and deliberate infringement, this is an "exceptional case" within the meaning of 35 U.S.C. § 285.

WHEREFORE, Plaintiff, Starmark, prays for the following relief:

A. Judgment for Starmark on its cause of action for patent infringement,

B. Preliminary and permanent injunctions enjoining defendant, its officers, directors, agents, and employees and all those in active concert or participation with them who receive notice of the judgment by personal service or otherwise, from making, using, importing, and selling and offering to sell any products, services and/or commercial activities made and/or practiced according to the teachings of the Starmark patent and from otherwise infringing, contributing to

infringement and actively inducing infringement of the Starmark patent,

C. An award of compensatory and punitive damages to Starmark by reason of the wrongs committed by defendant, including an award of increased damages pursuant to 35 U.S.C. § 284, for defendant's willful and deliberate patent infringement,

D. An award of costs of this action together with Starmark's attorney's fees pursuant to 35 U.S.C. § 265,

E. Such other and further relief as this Court deems just and proper.

COUNT II - VIOLATION OF THE LANHAM ACT - UNFAIR COMPETITION

43. Starmark incorporates herein the allegations of Paragraphs 1 through 43 as if fully set forth at length.

44. By the actions alleged herein, defendant has violated 15 U.S.C. § 1125 by using false or misleading descriptions and representations of fact in commercial advertising or promotion, as well as false designations of origin, in connection with products, services and/or commercial activities in interstate commerce, and which descriptions and representations misrepresent the nature and qualities of Starmark's products, services and/or commercial activities, all to the damage of Starmark.

45. Those statements of defendant have a tendency to deceive or create confusion in a substantial portion of the intended audience, and that deception or confusion is material and likely to influence investment or purchasing decisions.

46. Those statements of defendant's affect or are likely to affect interstate commerce.

47. Starmark has been and will continue to be injured in its commercial interests, business and property, as a result of defendant's statements by such factors as, without limitation, business disruption, loss of present and future customers, loss of goodwill, loss of future sales to present in potential customers and other competitive disadvantages.

48. Starmark also believes, and therefore avers, that as a result of the defendant's acts:

a. Starmark has suffered damages in an amount not yet ascertained; and

b. Defendant has obtained and will obtain profits as a result of such violations which it is required to disgorge to Starmark.

49. Defendant's acts are willful and deliberate.

50. This is an exceptional case under 15 U.S.C. § 1117, entitling Starmark to an award of attorneys' fees.

51. Unless defendant is enjoined it will continue to engage in such activities and Starmark will suffer irreparable harm.

52. Starmark's remedy at law is inadequate by itself to compensate Starmark for the injuries inflicted by the defendant.

WHEREFORE, Plaintiff, Starmark, prays for the following relief:

A. Judgment for Starmark on its cause of action for violation of the Lanham Act,

B. Preliminary and permanent injunctions enjoining defendant, its officers, directors, agents, and employees and all those in active concert or

participation with them who receive notice of the judgment by personal service or otherwise, from advertising, promoting, describing, explaining or otherwise communicating in any manner or fashion false and misleading statements about its own products, services and/or commercial activities, and Starmark's patent.

C. An award of compensatory and punitive damages to Starmark by reason of the wrongs committed by defendant including an award of increased damages pursuant to 35 U.S.C. § 284, for defendant's willful and deliberate actions,

D. An award of costs of this action together with Starmark's attorney's fees pursuant to 35 U.S.C. § 265,

E. Such other and further relief as this Court deems just and proper.

COUNT III
- VIOLATION OF THE COMMON LAW OF UNFAIR COMPETITION
- PRODUCT DISPARAGEMENT/TRADE LIBEL

53. Starmark incorporates herein the allegations of Paragraphs 1 through 99 as if fully set forth at length.

54. Defendant has made false or misleading statements as to Starmark's as well as its own products, services and/or commercial activities.

55. Defendant knew or should have known those statements were false and/or acted in reckless disregard of their truth or falsity.

56. Defendant knew or should have known those statements would cause injury and loss to Starmark as well as damage to its commercial interests.

57. Defendant intended to cause injury and loss to Starmark by its statements.

58. Starmark has been and will continue to be injured as a result of defendant's statements, in its commercial interests, business and property, by such factors as, without limitation, business disruption, loss of present and future customers, loss of goodwill, loss of future sales to present in potential customers and other competitive disadvantages.

59. Unless defendant is enjoined it will continue to engage in such activities and Starmark will suffer irreparable harm.

60. Starmark's remedy at law is inadequate by itself to compensate Starmark for the injuries inflicted by the defendant.

61. Starmark is, therefore, entitled to injunctive relief.

62. Starmark believes, and therefore avers, that as a result of the defendant's acts:

a. Starmark has suffered damages in an amount not yet ascertained; and

b. Defendant has obtained and will obtain profits as a result of such violations which it is required to disgorge to Starmark.

63. Defendant's acts are willful and deliberate.

64. Unless defendant is enjoined it will continue to engage in such activities and Starmark will suffer irreparable harm.

65. Starmark's remedy at law is inadequate by itself to compensate Starmark for the injuries inflicted by the defendant.

WHEREFORE, Plaintiff, Starmark, prays for the following relief:

A. Judgment for Starmark on its cause of action for violation of the common law of unfair competition - product disparagement/trade libel,

B. Preliminary and permanent injunctions enjoining defendant, its officers, directors, agents, and employees and all those in active concert or participation with them who receive notice of the judgment by personal service or otherwise, from advertising, promoting, describing, explaining or otherwise communicating in any manner or fashion disparaging to libelous statements about their own and Starmark's products, services and/or commercial activities,

C. An award of compensatory and punitive damages to Starmark by reason of the wrongs committed by defendant,

D. An award of costs of this action together with Starmark's attorney's fees,

E. Such other and further relief as this Court deems just and proper.

**Starmark Laboratories**

By Its Attorney,

Dated: October 19, 2006

Joseph E. Chovanes, Esq.
Suite 329
5 Great Valley Parkway
Malvern, PA 19355
(610) 648-3994

# EXHIBIT A

US007109373B2

(12) **United States Patent**
**Boldt**

(10) **Patent No.: US 7,109,373 B2**
(45) **Date of Patent: Sep. 19, 2006**

(54) **CREATINE SALTS AND METHOD OF MAKING SAME**

(75) Inventor: **Matthias Boldt**, Oxnard, CA (US)

(73) Assignee: **SAN Corporation**, Oxnard, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/740,263**

(22) Filed: **Dec. 18, 2003**

(65) **Prior Publication Data**

US 2004/0133040 A1 Jul. 8, 2004

**Related U.S. Application Data**

(60) Provisional application No. 60/434,245, filed on Dec. 18, 2002.

(51) **Int. Cl.**
***C07C 279/10*** (2006.01)

(52) **U.S. Cl.** .................................................... **562/560**

(58) **Field of Classification Search** ............... 562/560, 562/584

See application file for complete history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,973,199 A * 10/1999 Negrisoli et al. ........... 562/560
6,211,407 B1 * 4/2001 Thomson .................... 562/560
2003/0212136 A1 11/2003 Vonnorstrom et al.
2004/0077902 A1 * 4/2004 Llewellyn .................. 562/580

OTHER PUBLICATIONS

Dox, A.W. et al., "Esterification of Creatine", The Journal of Biological Chemistry (Oct. 1922), pp. 671-673, vol. LIV, No. 4, Pub. from the Dept. Chem. Res., Parke, Davis & Co.

* cited by examiner

*Primary Examiner*—Sikarl A. Witherspoon

(57) **ABSTRACT**

Disclosed are creatine salts having the general formula




wherein A represents an anion of a dicarboxylic acid, and a process of making such salts.

**13 Claims, No Drawings**

## CREATINE SALTS AND METHOD OF MAKING SAME

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims priority to provisional U.S. patent application No. 60/434,245, filed Dec. 18, 2002.

### BACKGROUND

The embodiments relate to creatine salts and method of making such salts.

Creatine, or N-(aminoiminomethyl)-N-methylglycine, is a sarcosine derivative present in the muscle tissue of many vertebrates, including man. Creatine is a central component of the metabolic system, and is involved in the provision of energy for work and exercise performance. Phosphocreatine (also known as creatine phosphate and phosphoryl creatine) helps provide Adenosine TriPhosphate (ATP) during short bursts of high intensity exercise, and it has been found that the depletion of phosphocreatine has been associated with the onset of fatigue. It has also been discovered that the phosphocreatine pool in skeletal muscle is expandable. This has led to the oral supplementation of creatine and phosphocreatine to increase the levels of these components in muscle, to thereby enhance exercise performance during intermittent activities that require strength and power. WO 94/02127, published on Feb. 3, 1994, discloses the use of creatine, optionally combined with amino acids or other components, in order to increase the muscle performance in mammals.

Creatine is synthesized from amino acids in the liver, pancreas and kidney, by the transfer of the guanidine moiety of arginine to glycine, which is then methylated to form creatine. Creatine which is synthesized in the liver, pancreas and kidney, is released into the bloodstream and actively taken up by the muscle cells, using the Na+ gradient. Creatine oral supplementation has been used in the prior art to increase creatine and creatine phosphate stores, which are needed for high energy phosphorus metabolism. Recovery after high intensity exercise involves a resynthesis of phosphocreatine, which occurs via an oxygen-dependent process with half-life of about 30 seconds. During short-term high intensity intermittent exercise, the active muscles rely heavily on phosphocreatine for production of ATP. The rate of phosphocreatine resynthesis can be accelerated by the use of creatine supplementation in subjects who demonstrated an increase in creatine concentration. The benefits of creatine supplementation are particularly evident in high intensity activities that are intermittent in nature.

The creatine transport protein has an increased affinity for creatine and concentrates creatine within the cell. Once inside the cell, very little creatine is lost (approximately 2 grams per day in a 70 kg male). Based upon this information, it follows that small increases of plasma creatine (which can occur with creatine supplementation) result in increased transport activity. The loss of creatine from skeletal muscle is typically about 3% per day, which closely matches the amount of creatinine non-enzymatically produced by living human muscle. The main mechanism by which creatine is lost, is the conversion of creatine to creatinine, which is an irreversible non-enzymatic process. Thus, creatine lost from a cell is considered to be negligible, and the concentration of creatine in the cell is not at risk of depletion by virtue of



exercise. Thus, the main advantage of creatine administration is in the fact that cellular creatine concentration is stable and not prone to being lost.

The most commonly used creatine supplement for oral consumption, is creatine monohydrate. Body builders find that shortly after beginning the use of creatine as a nutritional supplement, muscles take on additional mass and definition. Thus creatine supplements are becoming more popular as a steroid-free means of improving athletic performance and strength. Increasing the creatine in a diet may therefore be useful to increase the blood plasma level of creatine and thus increase the amount of creatine in the muscles.

Creatine monohydrate is most commonly sold as a nutritional supplement in powder form. The powder may be blended with juices or other fluids, and then ingested. Prompt ingestion is important, because creatine is not stable in acidic solutions, such as juices. If creatine is retained in acidic solutions for even relatively short periods of time, most or all of the creatine in this solution converts to creatinine, which does not have the beneficial effects of creatine.

Creatine monohydrate supplementation at a dosage of 20 grams per day for a 5 day period has been the standard used during most studies in humans. Conventionally, creatine monohydrate is dissolved in approximately 300 milliliters of warm to hot water, the increased water temperature thereby increasing the solubility of creatine monohydrate. It has been found that creatine is not decomposed in the alimentary tract after oral administration, since there is no appreciable increase in urinary urea or ammonia. The results obtained for the conversion of retained creatine to creatinine have led researchers to believe that creatine is completely absorbed from the alimentary tract, then carried to the tissues, and hence either stored in the tissues or immediately rejected and eliminated by way of the kidneys.

Another problem with existing creatine supplementation is in the ability to provide consistent uniform results. It is believed that these inconsistent results arise because of the current methods of delivering creatine to the human body area. Current creatine oral supplementation, as discussed above relies on the use of creatine in powder form, which is dissolved in water and then taken orally. However, creatine in powder form does not dissolve well in water or other neutral pH liquids. The solubility of creatine in water is low, about 1 g in 75 ml. To obtain 10 grams, a subject would have to consume almost a liter of liquid. While increasing the temperature of the water increases the solubility of creatine monohydrate, there still is no consistency in the amount of creatine that is effectively dissolved in the water. For this reason, the consumer will take in varying amounts of creatine when consuming creatine monohydrate powder dissolved in water or other liquids.

Furthermore, the half-life of creatine in blood plasma is short (1–1.5 hours). This makes it necessary to reach high blood plasma levels rapidly. In view of the bioavailability of creatine, such blood plasma levels can be obtained only by the administration of high doses of creatine, e.g. 5–10 g for mean body weights of about 70 kg. Such high amounts are well tolerated because the toxicity of creatine is quite low.

Creatine monohydrate can be used to manufacture various salts. U.S. Pat. No. 5,973,199 (hereinafter "the '199 patent") discloses a creatine salts having the general formula:




where A represents an anion of citric acid, maleic acid, fumaric acid, malic acid or tartaric acid. A molar excess of creatine, such as would be needed to make dicreatine salts, is not disclosed.

U.S. Pat. No. 5,925,378 (hereinafter the '378 patent) discloses an effervescent form of creatine comprising a tablet of creatine citrate, citric acid, sodium carbonate, sodium bicarbonate, dextrose and other ingredients. There is no disclosure or suggestion that the creatine citrate comprises anything other than a one-to-one molar ratio of creatine and citrate anion, as in the '199 patent.

It would be desirable to provide another form of creatine salt that is stable, and that can prevent or impede the conversion of creatine to creatinine, and which can provide multiple moles of creatine per mole of acid.

## SUMMARY OF THE INVENTION

The embodiments provide creatine salts of the general formula:




wherein A represents an anion of a dicarboxylic acid.

In one embodiment, A is an anion of maleic acid. In another embodiment, A in an anion of malic acid. The compounds of the embodiments are characterized by having 2 molecules of creatine per molecule of anion.

Another embodiment provides a process of making these creatine salts.

## DETAILED DESCRIPTION

This disclosure provides a description of certain embodiments of the invention to further an understanding of the invention. It is to be understood that both the foregoing general description and the following detailed description are exemplary and explanatory only and are intended to provide further explanation of the present invention, as claimed.

The embodiments provide hydrosoluble, stable organic salts of creatine characterized by high water solubility and a process for preparing these salts. The creatine salts comprise two molecules of creatine and one molecule of anion derived from a dicarboxylic acid. Suitable dicarboxylic acids include malic acid, furmaric acid, maleic acid, and tartaric acid.

The salts of are prepared by salifying creatine with the corresponding organic acids in aqueous or preferably alcohol concentrated solution or in a water miscible solvent, at temperatures ranging from room temperature to 50° C., optionally concentrating the solutions, and filtering the crystallized salts. In the embodiments the compounds are prepared by reacting a molar excess of creatine with an



organic dicarboxylic acid in a suitable solvent, until the compound is completely formed, cooling and filtering the resulting compound. The filtrated solvent may be recycled and used for a further reaction. The molar excess of creatine to carboxylic acid will be in a ratio of at least 2:1.

Any food grade form of the constituent compounds may be used in the process. Creatine monohydrate or anhydrous creatine may be employed to advantage as reactants. Similarly, food grade forms of maleic acid, malic acid, fumaric acid and tartaric acid may be employed.

## EXAMPLE 1

Large scale quantities of the dicreatine maleate may be made in a batch process in the following manner.

A reactor is charged with 2,400 gallons of anhydrous methanol. With stirring, 781 kilograms (6,845 moles) of maleic acid is added to the methanol. Any suitable food grade maleic acid may be used. Stirring should continue until all of the maleic acid is dissolved.

Thereafter, with continued agitation, creatine monohydrate is added to the methanol/maleic acid mixture. Any suitable food grade creatine monohydrate may be used. One such creatine is available as Catalog No. C-114 from Pfanstiehl Laboratories, Waukegan, Ill. In this embodiment, at least 2050 kg of the creatine monohydrate is added to achieve at least a 2:1 molar ratio of creatine:maleic acid. Once all of the creatine monohydrate has been added, stirring should continue for approximately four (4) hours to allow the materials to react.

The finished product is dicreatine maleate, having two creatine molecules per maleate anion. The finished dicreatine maleate may be separated using crystallization, optionally preceded by distillation to concentrate the product. One skilled in the art will recognize other appropriate separation techniques that may be used to isolate the dicreatine maleate.

The crystallized dicreatine maleate product is filtered from the reaction mixture and collected. The filtrate is washed with anhydrous methanol to remove any byproducts or other impurities. The solid dicreatine maleate product is dried at a suitable temperature. The resulting crystalline material is ground to a free flowing consistency and packaged. If appropriate, suitable flavors and sweeteners may be added. The creatine content of the product is approximately 70% on a weight basis.

## EXAMPLE 2

Dicreatine malate may be manufactured using a similar procedure but substituting malic acid for maleic acid. An exemplary bench-scale procedure is set forth below.

Five liters of anhydrous methanol are charged to a clean reactor. With stirring, 350 grams of anhydrous malic acid (2.6 moles) is added to the anhydrous methanol. The resulting mixture is stirred until dissolution is complete. Then, at least 775 grams (5.2 moles) of creatine monohydrate is added to the malic acid/methanol mixture. This mixture is stirred for approximately four (4) hours.

After the four hours have passed, the product is filtered and washed with anhydrous methanol. The finished product is dried. The product is approximately 66% creatine on a weight basis.

EXAMPLE 3

Example 2 is repeated, except that tartaric acid is substituted for malic acid. The quantities of tartaric acid and creatine are adjusted to provide at least creatine in a molar excess of at least 2:1.

EXAMPLE 4

Example 2 is repeated using fumaric acid in lieu of the malic acid and adjusting the quantities of fumaric acid and creatine to provide at least a 2:1 molar excess of creatine.

While the specific embodiments have been illustrated and described, numerous modifications may be made without significantly departing from the spirit and scope of the invention.

I claim:

**1**. A creatine salt having the formula




wherein A represents an anion of a dicarboxylic acid.

**2**. The creatine salt of claim **1**, wherein A is an anion of maleic acid, malic acid, fumaric acid, or tartaric acid.

**3**. The creatine salt of claim **1**, wherein A is an anion of malic acid.

**4**. The creatine salt of claim **1**, wherein A is an anion of maleic acid.



**5**. The creatine salt of claim **1**, wherein A is an anion of fumaric acid.

**6**. The creatine salt of claim **1**, wherein A is an anion of tartaric acid.

**7**. A process comprising reacting a molar excess of creatine monohydrate and a dicarboxylic acid or a tricarboxylic acid with heat to form a creatine salt having the formula:




wherein A represents an anion of a dicarboxylic acid.

**8**. The process of claim **7**, wherein the reaction is carried out in an alcohol solvent.

**9**. The process of claim **7**, further comprising separating and drying the creatine salt.

**10**. The process of claim **7**, wherein A is an anion of malic acid.

**11**. The process of claim **7**, wherein A is an anion of maleic acid.

**12**. The process of claim **7**, wherein A is an anion of fumaric acid.

**13**. The process of claim **7**, wherein A is an anion of tartaric acid.

* * * * *

# EXHIBIT B

CREATIVE COMPOUNDS

August 28, 2006

George Barron, President
Kaizen Nutrition Inc
13800 Gramercy Place
Gardena, CA 90249

Creative Compounds' patent for Dicreatine Malate has recently been allowed. It has come to my attention that your company has either had or does have Dicreatine Malate or Tricreatine Malate in at least one or more of your products. As you can see from the attached letter from my legal counsel, our patent is very broad and will allow us to control the sale of this compound. It also addresses our stand on the use of Tricreatine Malate. Malic acid is a dicarboxylic acid, which means there are only two points of attachment. Therefore, Tricreatine Malate is a physical impossibility.

I am aware that many in the industry have ignored the fact that Creative Compounds had a patent pending on Dicreatine Malate and have marketed this material or simply used Tricreatine Malate thinking you could do so until a patent was actually granted. I am also aware that many of you did so to get the compound cheaper than Creative Compounds was marketing it for. I am here to inform you that I have many options available to me to resolve that thought process.

First of all, for those of you with Dicreatine Malate in your product, you can purchase 2CM™ Dicreatine Malate from Creative Compounds. For those of you with Tricreatine Malate in your product, you will need to change it to Dicreatine Malate and purchase 2CM™ Dicreatine Malate from Creative Compounds. I will require that 2CM™ be used on all labels.

For those of you that feel that Creative Compounds' price is too high compared to what you have been paying or that you will just simply remove it from your product, please understand that my other option is to pursue legal action for past infringement which can go back to the date of my application. This means that we may legally pursue past royalties for using either Dicreatine Malate or Tricreatine Malate in a product over the past 3 ½ years.

I feel that this is a very good compound and our first option is to work with as many companies as possible to keep supplying 2CM™ Dicreatine Malate. This is the best option for everyone, but I will not hesitate to pursue legal action if that is the only option given to me. Please respond as to your intent no later than September 15th, 2006. At that point I will evaluate the option I need to pursue for each company. Creative Compounds has many Patents pending on many products being used in the market such as Diarginine Malate, Octopamine HCL, Arachidonic Acid and 7 beta hydroxy DHEA.

Best regards,

Gary L. Haynes
President & CEO

P.O. Box 4011 · Scott City MO 63780
Tel: 877·203·6010 · Fax · 573 264 1444
www.creativecompounds.com

# EXHIBIT C

ADORNO & YOSS
A LIMITED LIABILITY PARTNERSHIP
1000 VERMONT AVENUE, NW
SUITE 490
WASHINGTON, DC 20005
PHONE: (202) 408-5700, FAX: (202) 408-7677
WWW.ADORNO.COM

THOMAS L. PETERSON

EMAIL: TPETERSON@ADORNO.COM

August 25, 2006

Mr. Gary L. Haynes
Creative Compounds, LLC
2230 Main Street
Scott City, MO 63780

**Re:** **Patent Office Notice of Allowance for Dicreatine Malate**

Dear Gary:

The U.S. Patent and Trademark Office has issued a Notice of Allowance for Creative Compounds' patent application on *Dicreatine Malate*. Thus, a patent soon will issue from this application.

The claims in the allowed patent application are quite broad and will allow Creative Compounds to control the sale of *Dicreatine Malate* in the industry.

I am also aware that some in the industry are mislabeling shipments of *Dicretine Malate* as *Tricreatine Malate* in an apparent attempt to conceal their infringement of the Creative patent. I am advised by technical consultants that it is not possible to make *Tricreatine Malate* as malic acid is a dicarboxylic acid that has only two points of attachment. Thus, the Creative patent covers this so-called *Tricreatine Malate* as well.

It has also come to my attention that SAN Corporation has sent a number of threatening letters to the industry alleging that it also has received a Notice of Allowance of its patent application entitled *Creatine Salts and Method of Making Same*. These letters purport to put the industry on notice of infringement of the patent which, according to SAN, will soon issue.

Even if SAN is correct that a patent will issue from its application, the patent will not be enforceable because of your prior inventions and work.

I have reviewed the documents sent to me by you. These documents conclusively establish that your work on dicreatine substantially predates the SAN work. Thus, I do not believe that a patent issued to SAN on its application would be enforceable. In fact, had the Patent Office known of your earlier work, the SAN application would have been rejected on its face.

I will keep you posted of any further developments related to SAN. Should you have any questions in the interim, please do not hesitate to contact me.

Very truly yours,

Thomas L. Peterson

TLP/

# EXHIBIT D

IOVATE

Andrea L. Bauer
*Senior Legal IP Counsel*
andrea.bauer@iovate.com
Tel: 905.290.4383

5100 Spectrum Way
Mississauga, Ontario
L4W 5S2
Canada

September 22, 2006

SAN Corporation
716 N. Ventura Road
Suite 431
Oxnard, CA 93030

Attention: Mr. Matthias Boldt, President

Dear Mr. Boldt:

**Re: U.S. Patent 7,109,373**

In light of your letters dated August 9, 2006 and September 20, 2006, we have reviewed the matter in regards to the above referenced patent application. Upon our evaluation of the matter, we do not believe U.S. Patent 7,109,373 to be valid in light of U.S. Patent Application 2004-0020263. Nevertheless, moving forward, Iovate Health Science Research Inc. will no longer be using compounds covered by the 7,109,373 Patent in any of its formulations or listed on product labeling.

If you require anything further or would like to discuss any issues, please feel free to contact me at 905-290-4383.

Yours truly,

A Bauer

Andrea Bauer
*Senior Legal IP Counsel*
ALB/cp

cc: G. Bogle