IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STARMARK LABORATORIES, INCORPORATED,
Plaintiff,

v.

CREATIVE COMPOUNDS, LLC,
Defendant.

Civil Action No. 2:06-CV-04745-JD

JURY TRIAL DEMANDED

FILED
OCT 16 2007
MICHAEL E. KUNZ, Clerk
By Dep. Clerk

FIRST AMENDED COMPLAINT

COMES NOW, plaintiff Starmark Laboratories, Incorporated ("Starmark"), by and through its undersigned counsel, and for its First Amended Complaint against defendant Creative Compounds, LLC, alleges as follows:

JURISDICTION AND VENUE

1. This is an action for patent infringement arising, in part, under the patent laws of the United States. 35 U.S.C. § 100 *et. seq*. This is also an action for declaratory judgment and for unfair competition arising under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Lanham Act, 15 U.S.C. § 1125.

2. Jurisdiction in this Court is conferred pursuant to 28 U.S.C. § 1336(a) and this Court's authority to decide pendant claims related to the federal claims.

3. Venue is conferred in this judicial district by virtue of 28 U.S.C. § 1391(a) in that the Defendant conducts significant business activities in this district and is selling

the infringing product in this district. Venue is also conferred by virtue of 28 U.S.C. § 1400(b).

## THE PARTIES

4. Starmark is a corporation organized and existing under the laws of the State of Oregon, having its principal place of business at 11047 N.W. 122nd Street, Medley, FL 33176.

5. Defendant Creative is a limited liability company organized and existing under the laws of the State of Nevada, having a place of business at 2230 Main Street, Scott City, MO 63780. Defendant Creative is selling and marketing its infringing product in this district.

6. Starmark and Defendant are competitors.

## FACTS COMMON TO ALL COUNTS

7. Starmark is the owner by assignment of all right, title and interest in and to United States Patent No. 7,109,373 (the "'373 Patent") entitled "Creatine Salts and Method of Making Same." A true and correct copy of the '373 Patent is attached hereto as "Exhibit A." Matthias Boldt ("Mr. Boldt") is the inventor of the '373 Patent which he assigned to Starmark in November, 2006.

8. In or about December, 2001, Mr. Boldt conceived of the novel and revolutionary idea for the compounds disclosed and claimed in the '373 Patent. In December 2002, based upon that conception, Mr. Boldt filed a provisional patent

application with the United States Patent and Trademark Office ("PTO"). The 373 Patent was duly and legally issued and is valid and enforceable in all respects.

9. The '373 Patent discloses and claims a unique dietary supplement known as Creatine Salts. Creatine Salts are used in athletic training and other endeavors. Creatine is difficult to efficiently absorb in the body. Therefore, producing a supplement that increases the absorption efficiency by the body of Creatine has long been a desired goal in the supplement industry and has great value to consumers and sellers of this product.

10. Starmark also sells a Creatine product covered by the claims of the '373 Patent under the trade name "Element Hydrosoluble Creatine Salt." This product has enjoyed tremendous commercial success.

11. Rather than compete fairly with Starmark and independently attempt to engineer its own Creatine Salts, Defendant Creative has: (1) willfully infringed the claims of Starmark's '373 Patent; (2) filed its own patent application and failed to disclose Starmark's patent; and (3) disparaged the '373 Patent with maliciously false statements about Starmark's patent and company and about Defendant's alleged rights to control the sale and manufacture of this product.

12. Defendant Creative filed a United States Patent application which eventually issued on April 30, 2003 as United States Patent No. 7,129,273 (the "273 Patent"). Defendant's initial patent application was filed over five months after plaintiff Starmark's original patent application which resulted in the issuance of Starmark's '373

Patent. (A true and correct copy of Defendant's '273 Patent is attached here to as "Exhibit B.")

13. On information and belief, Defendant Creative's patent is invalid.

14. Defendant Creative is now unlawfully using, making and selling a compound sold under the tradename "2CM," including, but not limited to, sales within this judicial district and throughout the United States.

15. Defendant Creative's 2CM product is covered by the claims of plaintiff Starmark's '373 Patent both literally and under the doctrine of equivalents.

16. Defendant Creative's making, using, offering for sale and selling of 2CM in this judicial district and elsewhere in the United States constitutes both direct and contributory infringement of the claims of the '373 Patent, in violation of 35 U.S.C. § 271.

17. Defendant Creative's making, using, selling, and offering for sale of 2CM in this judicial district and elsewhere in the United States constitutes active inducement to infringe the claims of the '373 Patent, in violation of 35 U.S.C. § 271.

18. Defendant Creative's active, willful and contributory infringement of the claims of the '373 Patent and active inducement to infringe the claims of the '373 Patent was and is without license from Starmark and is in violation of Starmark's patent rights.

19. Defendant Creative will continue to infringe Starmark's patent rights unless preliminarily and permanently enjoined by this Court.

20. Upon information and belief, defendant Creative's acts of infringement have been willful and deliberate, with full knowledge of Starmark's rights in its '373 Patent.

21. As a result of defendant Creative's active and contributory infringement of the claims of the '373 Patent and Defendant's active inducement to infringe the claims of that patent, Starmark has been damaged and will continue to be damaged.

22. Starmark has suffered and will continue to suffer irreparable injury unless the infringing activities of defendant Creative are enjoined.

23. By virtue of defendant Creative's willful and deliberate infringement, this case is "exceptional case" within the meaning of 35 U.S.C. § 285 thereby justifying an award of attorneys' fees.

24. Defendant Creative has falsely advertised, as well as falsely published information about its 2CM product as well as Starmark's rights to market and sell plaintiff's Creatine Salts product.

25. For example, Defendant Creative has falsely claimed that it is the original and true inventors of Dicreatine Malate and that defendant had invented Dicreatine Malate before plaintiff Starmark. (A true and correct copy of correspondence from defendant Creative is "Exhibit C" hereto.) These statements were false and fraudulent when made.

26. Defendant Creative has falsely notified other potential licensees of Starmark's '373 Patent that Creative has superior rights to that of Starmark. Creative's

statements were made with the intent and effect of harming plaintiff's business reputation resulting in a substantial loss of revenue. (See "Exhibit C" hereto.)

27. Upon information and belief, the defendant Creative's false statements are being promulgated in an attempt to disparage the invention disclosed and claimed in Starmark's '373 Patent in an unlawful attempt to cause Starmark competitive harm.

28. Upon information and belief, defendant Creative's statements are false and fraudulent, knowingly incorrect and without privilege. Defendant intends that others rely upon those false statements in making them.

29. Upon information and belief, defendant Creative made these representations knowing they are false and intending that the statements would be acted on to the detriment of Starmark.

**COUNT I**
**PATENT INFRINGEMENT**

30. Starmark incorporates all prior paragraphs as if fully set forth at length herein.

31. Defendant Creative's product is covered by the claims of the '373 Patent.

32. Defendant Creative sells its 2CM product in this judicial district and throughout the United States.

33. Defendant Creative is making, using, selling, importing, and offering for sale its 2CM product which is covered by the claims of the '373 Patent.

34. The Defendant's 2CM product infringes the claims of the '373 Patent both literally and under the "doctrine of equivalents."

35. The making, using, offering for sale and selling of 2CM in this judicial district and elsewhere in the United States constitutes direct and contributory infringement by the Defendant of, and active inducement by the Defendant to, infringe the claims of the '373 Patent, all in violation of 35 U.S.C. § 271.

36. Defendant Creative's infringement of the claims of the '373 Patent has been without license from Starmark and in violation of Starmark's rights, and it is believed that the defendant will continue to infringe Starmark's patent rights unless preliminarily and permanently enjoined by this Court.

37. Upon information and belief, defendant Creative's acts of infringement have been wanton, willful and deliberate, and have been made with the full knowledge of Starmark's rights in the '373 Patent.

38. As a result of defendant Creative's infringement of the claims of the '373 Patent, Starmark has been damaged and will continue to be damaged in an amount to be determined at trial.

39. Starmark has suffered and will continue to suffer irreparable injury unless the defendant Creative's infringing activities are enjoined.

40. By virtue of defendant Creative's willful and deliberate infringement, this is an "exceptional case" within the meaning of 35 U.S.C. § 285 thereby justifying an award of attorneys' fees.

**WHEREFORE**, Starmark Laboratories, Incorporated respectfully requests judgment in its favor and against defendant Creative Compounds, LLC for all damages, including, but not limited to, lost profits and in no event an amount less than a reasonable royalty, plus costs and attorneys fees as provided for by 35 U.S.C. § 285 along with such other equitable and monetary relief the Court deems just including but not limited to preliminary and permanent injunctive relief enjoining defendants Creative, its officers, directors, agents and employees and all those in active concert or participation with Creative from making, using, importing, selling and offering to sell any products or services covered by the claims of the '373 Patent and from otherwise infringing, contributing to infringement and actively inducing infringement of the claims of the '373 Patent.

**COUNT II**
**DECLARATORY RELIEF**

41. Starmark incorporates all prior paragraphs as if fully set forth at length herein.

42. This Count is for declaratory judgment pursuant to 28 U.S.C. § 2201.

43. As a direct and proximate result of the conduct of defendant Creative, plaintiff Starmark has a reasonable apprehension that Creative will bring a patent infringement action against Starmark, its customers or its licensees.

44. Defendant Creative's '273 Patent fails to meet the requirement of the patent laws of the United States, including one or more provisions of 35 U.S.C. §§ 101, 102, 103 and 112 and its claims are therefore invalid.

45. Starmark is entitled to declaratory judgment that the claims of defendant Creative's '273 Patent are invalid.

**WHEREFORE**, Starmark Laboratories, Incorporated respectfully requests judgment in its favor and against defendant Creative Coumpounds, LLC declaring the claims of the '273 Patent to be invalid, awarding Starmark its costs and attorneys fees pursuant to 35 U.S.C. § 285 due to the exceptional nature of this case, as well as all other relief that the Court deems equitable, just and appropriate.

**COUNT III**
**LANHAM ACT UNFAIR COMPETITION**
**(15 U.S.C. § 1125)**

46. Starmark incorporates all prior paragraphs as if fully set forth at length herein.

47. By the actions alleged herein, defendant Creative has violated 15 U.S.C. § 1125 by using false and misleading descriptions and representations of fact in commercial advertising or promotion, as well as false designations of origin, in connection with products, services, and/or commercial activities in interstate commerce, and which descriptions and representations misrepresent the nature and qualities of Starmark's patent, products, services and/or commercial activities, all to the detriment of Starmark.

48. Those statements of defendant Creative have a tendency to deceive or create confusion in a substantial portion of the intended audience and that deception or confusion is material and likely to influence investment or purchasing decisions.

49. Those statements of defendant Creative affect or are likely to affect interstate commerce.

50. Starmark has been, and will continue to be injured in its commercial interests, business and property as a result of defendant Creative's statements including, without limitation, business disruption, loss of present and future customers, loss of goodwill, loss of future sales, royalties, fees to present in potential customers and other competitive disadvantages.

51. As a direct and proximate result of defendant Creative's acts, Starmark has suffered damages in an amount not yet ascertained and has lost profits to Defendant which it is required to disgorge to Starmark.

52. Defendant Creative's acts are willful and deliberate.

53. This is an exceptional case under 15 U.S.C. § 1117, entitling Starmark to an award of attorneys' fees.

54. Unless defendant Creative is preliminarily and permanently enjoined, it will continue to engage in such activities and Starmark will suffer irreparable harm.

55. Starmark's remedy at law is inadequate to compensate Starmark for the injuries caused by defendant Creative's conduct.

**WHEREFORE**, plaintiff Starmark Laboratories, Incorporated respectfully requests judgment in its favor and against defendant Creative Compounds, LLC:

(a) enjoining Defendants and Creative's officers, directors, agents, and employees and all those in active concert or participation with them from advertising, promoting describing, explaining or otherwise communicating in any manner false and misleading statements about its products, services, and/or commercial activities and Starmark's patent, products, services, and/or commercial activities;

(b) awarding Starmark compensatory and punitive damages including an award of increased damages for Defendants' willful and deliberate actions, pursuant to 15 U.S.C. § 1117;

(c) awarding Starmark attorneys' fees and costs pursuant to 15 U.S.C. § 1117;

(d) awarding Starmark any such other relief this Court deems equitable, just and appropriate.

**COUNT IV**
**VIOLATION OF COMMON LAW UNFAIR**
**COMPETITION – PRODUCT DISPARAGEMENT/TRADE LIBEL**

56. Plaintiff Starmark incorporates all prior paragraphs as if fully set forth at length herein.

57. Defendant Creative has made false or misleading statements as to Starmark's products as well as its' own products, patents, inventions, services, and/or commercial activities.

58. Defendant Creative knew or should have known that those statements were false or fraudulent and acted in reckless disregard as to the statements' truth or falsity.

59. Defendant Creative knew or should have known that those statements would cause injury and loss to Starmark as well as damage to Starmark's commercial interests.

60. Defendant Creative intended to cause injury and loss to Starmark by its statements.

61. Plaintiff Starmark has been and will continue to be injured as a result of defendant's statements.

62. Unless defendant Creative is enjoined, it will continue to engage in such activities and Starmark will continue to suffer irreparable harm.

63. Starmark's remedy at law is inadequate to compensate Starmark for the injuries inflicted by defendant Creative.

64. Starmark is entitled to injunctive relief.

65. As a direct and proximate result of defendant Creative's acts, Starmark has suffered damages in an amount not yet ascertained and the defendant has obtained and will continue to obtain profits as a result of such acts which defendant is required to disgorge to Starmark.

66. Defendant Creative's acts are willful and deliberate.

**WHEREFORE**, plaintiff Starmark Laboratories, Incorporated respectfully requests judgment in its favor and against defendant Creative Compounds, LLC:

(a) for Defendants' violation of the common law of unfair competition – product disparagement/trade libel;

(b) enjoining defendant Creative, its officers, directors, agents, employees and all those in active concert or participation with them from advertising, promoting, describing, explaining or otherwise communicating in any manner disparaging or libelous statements about Starmark's products, services, and/or commercial interests;

(c) for compensatory and punitive damages to Starmark;

(d) for costs and attorneys' fees;

(e) for all such other relief this Court deems equitable, just and appropriate.

## COUNT V
## TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE CONTRACTUAL RELATIONS

67. Plaintiff Starmark incorporates all prior paragraphs as if fully set forth at length herein.

68. Starmark sells a Creatine product disclosed and claimed in plaintiff's '373 Patent under the trade name "Element Hydrosoluble Creatine Salt."

69. Defendant Creative, purposefully and with intent to harm Starmark, has sold its competing 2CM product to potential and existing buyers of Starmark's "Element Hydrosoluble Creatine Salt" and has falsely disparaged plaintiff's product and the validity of plaintiff's patent thus unlawfully interfering with plaintiff's abilities to earn revenues, royalties, and other fees.

70. Defendant Creative's actions are without privilege or justification.

71. As direct and proximate result of defendant Creative's conduct, Starmark has sustained actual damages including but not limited to the sales Starmark would have otherwise made to the buyers of Defendant's 2CM product.

**WHEREFORE**, plaintiff Starmark Laboratories, Incorporated respectfully requests judgment in its favor and against defendant Creative Compounds, LLC for lost profits, costs, attorneys' fees and the disgorgement of defendant's profits as well as all such other relief as the Court deems equitable, just and appropriate.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims to which it is so entitled.

Respectfully submitted,

Dated: October 15, 2007

/s/ Frederick A. Tecce

Gavin P. Lentz, Esq
Todd S. McGarvey, Esq.
BOCHETTO & LENTZ, P.C.
1524 Locust Street
Philadelphia, PA 19102
(215) 735-3900
(215) 735-2455 (fax)
glentz@bochettoandlentz.com
tmcgarvey@bochettoandlentz.com

Frederick A. Tecce, Esq.
**McSHEA\TECCE, P.C.**
The Bell Atlantic Tower – 28th Floor
1717 Arch Street
Philadelphia, PA 19103
(215) 599-0800
(215) 599-0888 (fax)
ftecce@mcshea-tecce.com

Attorneys for plaintiff
Starmark Laboratories, Incorporated

# Exhibit A

US007109373B2

(12) **United States Patent**
**Boldt**

(10) **Patent No.: US 7,109,373 B2**
(45) **Date of Patent: Sep. 19, 2006**

(54) **CREATINE SALTS AND METHOD OF MAKING SAME**

(75) Inventor: **Matthias Boldt**, Oxnard, CA (US)

(73) Assignee: **SAN Corporation**, Oxnard, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/740,263**

(22) Filed: **Dec. 18, 2003**

(65) **Prior Publication Data**

US 2004/0133040 A1 Jul. 8, 2004

**Related U.S. Application Data**

(60) Provisional application No. 60/434,245, filed on Dec. 18, 2002.

(51) **Int. Cl.**
*C07C 279/10* (2006.01)

(52) **U.S. Cl.** .......................................................... **562/560**

(58) **Field of Classification Search** ................ 562/560, 562/584

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,973,199 A * 10/1999 Negrisoli et al. ........... 562/560
6,211,407 B1 * 4/2001 Thomson .................... 562/560
2003/0212136 A1 11/2003 Vonnorstrom et al.
2004/0077902 A1 * 4/2004 Llewellyn ................... 562/580

OTHER PUBLICATIONS

Dox, A.W. et al., "Esterification of Creatine", The Journal of Biological Chemistry (Oct. 1922), pp. 671-673, vol. LIV, No. 4, Pub. from the Dept. Chem. Res., Parke, Davis & Co.

* cited by examiner

*Primary Examiner*—Sikarl A. Witherspoon

(57) **ABSTRACT**

Disclosed are creatine salts having the general formula




wherein A represents an anion of a dicarboxylic acid, and a process of making such salts.

**13 Claims, No Drawings**

# CREATINE SALTS AND METHOD OF MAKING SAME

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims priority to provisional U.S. patent application No. 60/434,245, filed Dec. 18, 2002.

## BACKGROUND

The embodiments relate to creatine salts and method of making such salts.

Creatine, or N-(aminoiminomethyl)-N-methylglycine, is a sarcosine derivative present in the muscle tissue of many vertebrates, including man. Creatine is a central component of the metabolic system, and is involved in the provision of energy for work and exercise performance. Phosphocreatine (also known as creatine phosphate and phosphoryl creatine) helps provide Adenosine TriPhosphate (ATP) during short bursts of high intensity exercise, and it has been found that the depletion of phosphocreatine has been associated with the onset of fatigue. It has also been discovered that the phosphocreatine pool in skeletal muscle is expandable. This has led to the oral supplementation of creatine and phosphocreatine to increase the levels of these components in muscle, to thereby enhance exercise performance during intermittent activities that require strength and power. WO 94/02127, published on Feb. 3, 1994, discloses the use of creatine, optionally combined with amino acids or other components, in order to increase the muscle performance in mammals.

Creatine is synthesized from amino acids in the liver, pancreas and kidney, by the transfer of the guanidine moiety of arginine to glycine, which is then methylated to form creatine. Creatine which is synthesized in the liver, pancreas and kidney, is released into the bloodstream and actively taken up by the muscle cells, using the Na+ gradient. Creatine oral supplementation has been used in the prior art to increase creatine and creatine phosphate stores, which are needed for high energy phosphorus metabolism. Recovery after high intensity exercise involves a resynthesis of phosphocreatine, which occurs via an oxygen-dependent process with half-life of about 30 seconds. During short-term high intensity intermittent exercise, the active muscles rely heavily on phosphocreatine for production of ATP. The rate of phosphocreatine resynthesis can be accelerated by the use of creatine supplementation in subjects who demonstrated an increase in creatine concentration. The benefits of creatine supplementation are particularly evident in high intensity activities that are intermittent in nature.

The creatine transport protein has an increased affinity for creatine and concentrates creatine within the cell. Once inside the cell, very little creatine is lost (approximately 2 grams per day in a 70 kg male). Based upon this information, it follows that small increases of plasma creatine (which can occur with creatine supplementation) result in increased transport activity. The loss of creatine from skeletal muscle is typically about 3% per day, which closely matches the amount of creatinine non-enzymatically produced by living human muscle. The main mechanism by which creatine is lost, is the conversion of creatine to creatinine, which is an irreversible non-enzymatic process. Thus, creatine lost from a cell is considered to be negligible, and the concentration of creatine in the cell is not at risk of depletion by virtue of exercise. Thus, the main advantage of creatine administration is in the fact that cellular creatine concentration is stable and not prone to being lost.



The most commonly used creatine supplement for oral consumption, is creatine monohydrate. Body builders find that shortly after beginning the use of creatine as a nutritional supplement, muscles take on additional mass and definition. Thus creatine supplements are becoming more popular as a steroid-free means of improving athletic performance and strength. Increasing the creatine in a diet may therefore be useful to increase the blood plasma level of creatine and thus increase the amount of creatine in the muscles.

Creatine monohydrate is most commonly sold as a nutritional supplement in powder form. The powder may be blended with juices or other fluids, and then ingested. Prompt ingestion is important, because creatine is not stable in acidic solutions, such as juices. If creatine is retained in acidic solutions for even relatively short periods of time, most or all of the creatine in this solution converts to creatinine, which does not have the beneficial effects of creatine.

Creatine monohydrate supplementation at a dosage of 20 grams per day for a 5 day period has been the standard used during most studies in humans. Conventionally, creatine monohydrate is dissolved in approximately 300 milliliters of warm to hot water. the increased water temperature thereby increasing the solubility of creatine monohydrate. It has been found that creatine is not decomposed in the alimentary tract after oral administration, since there is no appreciable increase in urinary urea or ammonia. The results obtained for the conversion of retained creatine to creatinine have led researchers to believe that creatine is completely absorbed from the alimentary tract, then carried to the tissues, and hence either stored in the tissues or immediately rejected and eliminated by way of the kidneys.

Another problem with existing creatine supplementation is in the ability to provide consistent uniform results. It is believed that these inconsistent results arise because of the current methods of delivering creatine to the human body area. Current creatine oral supplementation, as discussed above relies on the use of creatine in powder form, which is dissolved in water and then taken orally. However, creatine in powder form does not dissolve well in water or other neutral pH liquids. The solubility of creatine in water is low, about 1 g in 75 ml. To obtain 10 grams, a subject would have to consume almost a liter of liquid. While increasing the temperature of the water increases the solubility of creatine monohydrate, there still is no consistency in the amount of creatine that is effectively dissolved in the water. For this reason, the consumer will take in varying amounts of creatine when consuming creatine monohydrate powder dissolved in water or other liquids.

Furthermore, the half-life of creatine in blood plasma is short (1–1.5 hours). This makes it necessary to reach high blood plasma levels rapidly. In view of the bioavailability of creatine, such blood plasma levels can be obtained only by the administration of high doses of creatine, e.g. 5–10 g for mean body weights of about 70 kg. Such high amounts are well tolerated because the toxicity of creatine is quite low.

Creatine monohydrate can be used to manufacture various salts. U.S. Pat. No. 5,973,199 (hereinafter "the '199 patent") discloses a creatine salts having the general formula:



where A represents an anion of citric acid, maleic acid, fumaric acid, malic acid or tartaric acid. A molar excess of creatine, such as would be needed to make dicreatine salts, is not disclosed.

U.S. Pat. No. 5,925,378 (hereinafter the '378 patent) discloses an effervescent form of creatine comprising a tablet of creatine citrate, citric acid, sodium carbonate, sodium bicarbonate, dextrose and other ingredients. There is no disclosure or suggestion that the creatine citrate comprises anything other than a one-to-one molar ratio of creatine and citrate anion, as in the '199 patent.

It would be desirable to provide another form of creatine salt that is stable, and that can prevent or impede the conversion of creatine to creatinine, and which can provide multiple moles of creatine per mole of acid.

## SUMMARY OF THE INVENTION

The embodiments provide creatine salts of the general formula:



wherein A represents an anion of a dicarboxylic acid.

In one embodiment, A is an anion of maleic acid. In another embodiment, A in an anion of malic acid. The compounds of the embodiments are characterized by having 2 molecules of creatine per molecule of anion.

Another embodiment provides a process of making these creatine salts.

## DETAILED DESCRIPTION

This disclosure provides a description of certain embodiments of the invention to further an understanding of the invention. It is to be understood that both the foregoing general description and the following detailed description are exemplary and explanatory only and are intended to provide further explanation of the present invention, as claimed.

The embodiments provide hydrosoluble, stable organic salts of creatine characterized by high water solubility and a process for preparing these salts. The creatine salts comprise two molecules of creatine and one molecule of anion derived from a dicarboxylic acid. Suitable dicarboxylic acids include malic acid, furmaric acid, maleic acid, and tartaric acid.

The salts of are prepared by salifying creatine with the corresponding organic acids in aqueous or preferably alcohol concentrated solution or in a water miscible solvent, at temperatures ranging from room temperature to 50° C., optionally concentrating the solutions, and filtering the crystallized salts. In the embodiments the compounds are prepared by reacting a molar excess of creatine with an organic dicarboxylic acid in a suitable solvent, until the compound is completely formed, cooling and filtering the resulting compound. The filtrated solvent may be recycled and used for a further reaction. The molar excess of creatine to carboxylic acid will be in a ratio of at least 2:1.

Any food grade form of the constituent compounds may be used in the process. Creatine monohydrate or anhydrous creatine may be employed to advantage as reactants. Similarly, food grade forms of maleic acid, malic acid, fumaric acid and tartaric acid may be employed.

## EXAMPLE 1

Large scale quantities of the dicreatine maleate may be made in a batch process in the following manner.

A reactor is charged with 2,400 gallons of anhydrous methanol. With stirring, 781 kilograms (6,845 moles) of maleic acid is added to the methanol. Any suitable food grade maleic acid may be used. Stirring should continue until all of the maleic acid is dissolved.

Thereafter, with continued agitation, creatine monohydrate is added to the methanol/maleic acid mixture. Any suitable food grade creatine monohydrate may be used. One such creatine is available as Catalog No. C-114 from Pfanstiehl Laboratories, Waukegan, Ill. In this embodiment, at least 2050 kg of the creatine monohydrate is added to achieve at least a 2:1 molar ratio of creatine:maleic acid. Once all of the creatine monohydrate has been added, stirring should continue for approximately four (4) hours to allow the materials to react.

The finished product is dicreatine maleate, having two creatine molecules per maleate anion. The finished dicreatine maleate may be separated using crystallization, optionally preceded by distillation to concentrate the product. One skilled in the art will recognize other appropriate separation techniques that may be used to isolate the dicreatine maleate.

The crystallized dicreatine maleate product is filtered from the reaction mixture and collected. The filtrate is washed with anhydrous methanol to remove any byproducts or other impurities. The solid dicreatine maleate product is dried at a suitable temperature. The resulting crystalline material is ground to a free flowing consistency and packaged. If appropriate, suitable flavors and sweeteners may be added. The creatine content of the product is approximately 70% on a weight basis.

## EXAMPLE 2

Dicreatine malate may be manufactured using a similar procedure but substituting malic acid for maleic acid. An exemplary bench-scale procedure is set forth below.

Five liters of anhydrous methanol are charged to a clean reactor. With stirring, 350 grams of anhydrous malic acid (2.6 moles) is added to the anhydrous methanol. The resulting mixture is stirred until dissolution is complete. Then, at least 775 grams (5.2 moles) of creatine monohydrate is added to the malic acid/methanol mixture. This mixture is stirred for approximately four (4) hours.

After the four hours have passed, the product is filtered and washed with anhydrous methanol. The finished product is dried. The product is approximately 66% creatine on a weight basis.

EXAMPLE 3

Example 2 is repeated, except that tartaric acid is substituted for malic acid. The quantities of tartaric acid and creatine are adjusted to provide at least creatine in a molar excess of at least 2:1.

EXAMPLE 4

Example 2 is repeated using fumaric acid in lieu of the malic acid and adjusting the quantities of fumaric acid and creatine to provide at least a 2:1 molar excess of creatine.

While the specific embodiments have been illustrated and described, numerous modifications may be made without significantly departing from the spirit and scope of the invention.

I claim:

1. A creatine salt having the formula



wherein A represents an anion of a dicarboxylic acid.

2. The creatine salt of claim 1, wherein A is an anion of maleic acid, malic acid, fumaric acid, or tartaric acid.

3. The creatine salt of claim 1, wherein A is an anion of malic acid.

4. The creatine salt of claim 1, wherein A is an anion of maleic acid.



5. The creatine salt of claim 1, wherein A is an anion of fumaric acid.

6. The creatine salt of claim 1, wherein A is an anion of tartaric acid.

7. A process comprising reacting a molar excess of creatine monohydrate and a dicarboxylic acid or a tricarboxylic acid with heat to form a creatine salt having the formula:



wherein A represents an anion of a dicarboxylic acid.

8. The process of claim 7, wherein the reaction is carried out in an alcohol solvent.

9. The process of claim 7, further comprising separating and drying the creatine salt.

10. The process of claim 7, wherein A is an anion of malic acid.

11. The process of claim 7, wherein A is an anion of maleic acid.

12. The process of claim 7, wherein A is an anion of fumaric acid.

13. The process of claim 7, wherein A is an anion of tartaric acid.

* * * * *

# Exhibit B

US007129273B2

(12) **United States Patent**
**Cornelius et al.**

(10) **Patent No.:** **US 7,129,273 B2**
(45) **Date of Patent:** **Oct. 31, 2006**

(54) **DICREATINE MALATE**

(75) Inventors: **Derek Wayne Cornelius**, Cape Girardeau, MO (US); **Gary Lee Haynes**, Scott City, MO (US)

(73) Assignee: **Creative Compounds, LLC**, Scott City, MO (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 110 days.

(21) Appl. No.: **10/249,683**

(22) Filed: **Apr. 30, 2003**

(65) **Prior Publication Data**

US 2004/0220263 A1 Nov. 4, 2004

(51) **Int. Cl.**
***A61K 31/20*** (2006.01)
***C07C 251/00*** (2006.01)

(52) **U.S. Cl.** ........................................ **514/564**; 562/560

(58) **Field of Classification Search** .................. 562/60, 562/560

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2002/0150627 A1 * 10/2002 Stout et al. ................ 424/601

* cited by examiner

*Primary Examiner*—Paul A. Zucker

(57) **ABSTRACT**

This invention relates to a novel compound, dicreatine malate, comprising approximately two moles of creatine cations per one mole of malate anion. The creatine salt of this invention has been found to increase the bioavailability of both the creatine and malic acid moieties over and above the individual bioavailabilities of creatine monohydrate and malic acid base. Dicreatine malate vastly improves the production of Adenosine TriPhosphate (ATP) beyond the level of creatine monohydrate or any other creatine derivative. It also has a much greater efficacy in uses such as increasing muscle mass, increasing cell volumization, decreasing adipose stores, and for increasing overall strength and endurance.

**10 Claims, No Drawings**

# DICREATINE MALATE

## BACKGROUND OF INVENTION

Reference Cited [Referenced by]

U.S. Patent Documents:

U.S. Pat. No. 6,211,407 April, 2001 Thomson 562/560

U.S. Pat. No. 5,863,939 January, 1999 Pischel, et al. 514/474

U.S. Pat. No. 5,886,040 March, 1999 Fang 514/557

U.S. Pat. No. 5,973,199 October, 1999 Negrisoli, et al. 562/560

Other References:

G. E. Abraham and J. D. Flechas, Journal of Nutritional Medicine 1992: 3: 49 59.

V. V. Dunaev, et al., "Effect of Malic Acid Salts on Physical Work Capacity and its Recovery after Exhausting Muscular Activity," Famakol Toksikol 51(3) (1988): 1–25.

V. Bobyleva-Guarriero, et al., "The Role of Malate in Exercise-induced Enhancement of Mitochondrial Espiration," Arch Biochem Biophys 245(2) (19086): 470–76.

Le Boucher J, Cynober LA. "Ornithine alpha-ketoglutarate: the puzzle." Nutrition 1998; 14: 8703 [review].

Jeevanandam M, et al., "Ornithine-alpha-Ketogluterate (OKG) Supplementation is more effective than its component salts in traumatized rats." J. Nutr. 1996 September; 126(9): 2141-50.

## DETAILED DESCRIPTION

The present invention refers to a novel compound, dicreatine malate, its uses and biological effects. Since prior art gives no clue, the inventors were taken by surprise by the extraordinary properties and effects of dicreatine malate. Combining approximately two cations of creatine with one malic acid dianion into a single compound has shown to be much more effective and more readily absorbed than any other form of creatine or malic acid supplement currently available.

Dicreatine malate presents unique and useful synergistic attributes due to the combination of the malic acid and creatine. Both malic acid and creatine are essential in the production of Adenosine TriPhosphate (ATP). Either of these chemical entities are useful in the production of high energy phosphate molecules such as ATP. It would be expected that a 2:1 combination of creatine and malic acid would produce an additive effect at most on the production of these high energy phosphate molecules. However, although we are not certain of the exact reason, combining these two chemical entities in approximately a 2:1 ratio gives a compound that increases the production of ATP to a much greater extent than what would be expected by the mere additive effects of creatine and malic acid taken separately. It is now obvious to the inventors that some type of synergism is taking place between the creatine and malic acid when combined as dicreatine malate.

At first glance, this seemed impossible to the inventors as the effect should have definitely been additive. However, upon reviewing the literature, it was found that other ionic compounds have been also shown to display this unexpected synergism. For example, ornithine alpha-ketoglutarate has been shown to produce a strong anti-catabolic effect on burn victims far greater in effect than what is produced by merely combining the effects of the molar equivalents of ornithine base and alpha-ketoglutaric acid taken separately.

Creatine, also known as N-(Aminoiminomethyl) N-methylglycine is a naturally occurring metabolite found in red



muscle tissue. Creatine phosphate (also known as phosphocreatine) helps provide ATP during short bursts of high intensity exercise and has been associated with the onset of fatigue when there is a depletion of phosphocreatine.

Creatine is synthesized from amino acids in the liver, pancreas, and kidney, by the transfer of the guanidine moiety of arginine to glycine, which is then methylated to form creatine. It is then released into the bloodstream and actively taken up by the muscle cells.

Due to the body's inability to produce adequate amounts of creatine and phosphocreatine (and thus ATP), especially during times of high intensity activities, oral supplementation is needed. The dicreatine malate of this invention has been shown to be an ideal method of supplementing the body efficiently with an adequate amount of creatine, phosphocreatine and ATP.

Malic acid, a naturally occurring compound found in a wide variety of fruits and vegetables, is also present in all living cells and is essential in the production of ATP. Malic acid sparks the Krebs cycle and is the only metabolite of the cycle which falls in concentration during exhaustive physical activity. Depletion of malic acid has been linked to physical exhaustion. Malic acid supports the removal of compounds that build up under hypoxic conditions and inhibit ATP production. Malic acid is also a potent aluminum detoxifier and is effective in decreasing aluminum toxicity in various organs and tissues including the brain. It has also been show to aid in reducing muscle pain and increasing endurance.

U.S. Pat. No. 5,973,199 discloses a monocreatine malate, but does not have any disclosure for dicreatine malate. U.S. Pat. No. 5,973,199 only refers to the combination of one mole of creatine monohydrate with one mole of malic acid (monocreatine malate). Dicreatine malate requires approximately a two-to-one molar ratio of creatine to malic acid. U.S. Pat. No. 5,973,199 makes no mention of the superior combination of two creatine molecules with one malic acid molecule. Our experience shows that indeed the 1:1 molar ratio salt is inferior to the dicreatine malate of this invention.

U.S. Pat. No. 6,211,407 discloses di- and tri-creatine salts of citric acid, but makes no mention of any other dicreatine salts such as dicreatine malate. Furthermore, this patent makes no mention of any superiority in terms of enhanced metabolic effects such as vastly increased ATP production. In fact, the inventors have found that although the citric acid is a Krebs cycle intermediate, when combined with creatine in a 1:2 or 1:3 ratio it does not have the vastly improved effect of dicreatine malate.

Human dosaging for Dicreatine malate is in the range of about 1 mg/kg to 1 g/kg of bodyweight per day, and most preferable in the range of 20–220 mg/kg of bodyweight per day. Although the Dicreatine malate of this invention can be dosed once per day for a desired effect, we have found that it is best to divide the dosage into two or three equal amounts given eight to twelve hours apart. This helps to ensure steady blood values and an overall more powerful, consistent effect. Effective dosaging may be in the form of tablets, hard and soft gelatin capsules, sachets, effervescent powder or tablets, liquid or other oral delivery system known in the art.

The inventors have also found that this form of creatine gives added benefit by decreasing some of the problems associated with other creatine supplementation, such as cramping, bloating, and bioavailability issues. Further, Dicreatine malate has shown enhanced metabolic properties compared to creatine monohydrate, for example, enhanced efficacy for increasing muscle mass, enhanced efficacy for increasing cell volumization, enhanced efficacy for decreas-

ing adipose stores, enhanced efficacy for increasing for increasing overall strength and endurance. Still further, Dicreatine malate has been shown to increase the bioavailablities of both the creatine and malic acid moieties over the individual bioavailabilities of creatine monohydrate and malic acid.

The invention claimed is:

**1**. A dicreatine malate compound comprising approximately two creatine cations per one malic acid dianion.

**2**. A dicreatine malate compound in accordance with claim **1** comprising a creatine content of about 66 percent by weight and a malic acid content of about 33 percent by weight.

**3**. A dicreatine malate compound in accordance with claim **1** in the form selected from the group consisting of tablets, hard gelatin capsules, soft gelatin capsules, sachets, a powder, an effervescent powder, and a liquid.

**4**. A method of increasing the production of adenosine triphosphate in a human body comprising administering to a subject a dicreatine malate compound comprising approximately two creatine cations per one malic acid dianion.

**5**. A method in accordance with claim **4** wherein the dicreatine malate compound comprises a creatine content of about 66 percent by weight and a malic acid content of about 33 percent by weight.

**6**. A method in accordance with claim **4** wherein said administering to a subject a dicreatine malate compound comprises administering to a subject a dicreatine malate compound in a daily dosage of about 1mg/kg of bodyweight to about 1 g/kg of bodyweight.

**7**. A method in accordance with claim **6** wherein said administering to a subject a dicreatine malate compound comprises administering to a subject a dicreatine malate compound in a daily dosage of about 20mg/kg of bodyweight to about 220 mg/kg of bodyweight.

**8**. A method in accordance with claim **4** wherein said administering to a subject a dicreatine malate compound comprises administering to a subject a dicreatine malate compound in a daily dosage of about 1mg/kg of bodyweight to about 1 g/kg of bodyweight in two equal amounts given twelve hours apart.

**9**. A method in accordance with claim **4** wherein said administering to a subject a dicreatine malate compound comprises administering to a subject a dicreatine malate compound in a daily dosage of about 1mg/kg of bodyweight to about 1 g/kg of bodyweight in three equal amounts given eight hours apart.

**10**. A method in accordance with claim **4** wherein said administering to a subject a dicreatine malate compound comprises administering to a subject a dicreatine malate compound in the form selected from the group consisting of tablets, hard gelatin capsules, soft gelatin capsules, sachets, a powder, an effervescent powder, and a liquid.

* * * * *

# Exhibit C

C2 CREATIVE COMPOUNDS

August 28, 2006

George Barron, President
Kaizen Nutrition Inc
13800 Gramercy Place
Gardena, CA 90249

Creative Compounds' patent for Dicreatine Malate has recently been allowed. It has come to my attention that your company has either had or does have Dicreatine Malate or Tricreatine Malate in at least one or more of your products. As you can see from the attached letter from my legal counsel, our patent is very broad and will allow us to control the sale of this compound. It also addresses our stand on the use of Tricreatine Malate. Malic acid is a dicarboxylic acid, which means there are only two points of attachment. Therefore, Tricreatine Malate is a physical impossibility.

I am aware that many in the industry have ignored the fact that Creative Compounds had a patent pending on Dicreatine Malate and have marketed this material or simply used Tricreatine Malate thinking you could do so until a patent was actually granted. I am also aware that many of you did so to get the compound cheaper than Creative Compounds was marketing it for. I am here to inform you that I have many options available to me to resolve that thought process.

First of all, for those of you with Dicreatine Malate in your product, you can purchase 2CM™ Dicreatine Malate from Creative Compounds. For those of you with Tricreatine Malate in your product, you will need to change it to Dicreatine Malate and purchase 2CM™ Dicreatine Malate from Creative Compounds. I will require that 2CM™ be used on all labels.

For those of you that feel that Creative Compounds' price is too high compared to what you have been paying or that you will just simply remove it from your product, please understand that my other option is to pursue legal action for past infringement which can go back to the date of my application. This means that we may legally pursue past royalties for using either Dicreatine Malate or Tricreatine Malate in a product over the past 3 ½ years.

I feel that this is a very good compound and our first option is to work with as many companies as possible to keep supplying 2CM™ Dicreatine Malate. This is the best option for everyone, but I will not hesitate to pursue legal action if that is the only option given to me. Please respond as to your intent no later than September 15th, 2006. At that point I will evaluate the option I need to pursue for each company. Creative Compounds has many Patents pending on many products being used in the market such as Diarginine Malate, Octopamine HCL, Arachidonic Acid and 7 beta hydroxy DHEA.

Best regards,

[signature]

Gary L. Haynes
President & CEO

P.O. Box 4011 · Scott City MO 63780
Tel: 877·203·6010 · Fax· 573 264 1444
www.creativecompounds.com

ADORNO & YOSS
A LIMITED LIABILITY PARTNERSHIP
1000 VERMONT AVENUE, NW
SUITE 450
WASHINGTON, DC 20005
PHONE: (202) 408-5700, FAX: (202) 408-7677
WWW.ADORNO.COM

THOMAS L. PETERSON

EMAIL: TPETERSON@ADORNO.COM

August 25, 2006

Mr. Gary L. Haynes
Creative Compounds, LLC
2230 Main Street
Scott City, MO 63780

**Re: Patent Office Notice of Allowance for Dicreatine Malate**

Dear Gary:

The U.S. Patent and Trademark Office has issued a Notice of Allowance for Creative Compounds' patent application on *Dicreatine Malate*. Thus, a patent soon will issue from this application.

The claims in the allowed patent application are quite broad and will allow Creative Compounds to control the sale of *Dicreatine Malate* in the industry.

I am also aware that some in the industry are mislabeling shipments of *Dicretine Malate* as *Tricreatine Malate* in an apparent attempt to conceal their infringement of the Creative patent. I am advised by technical consultants that it is not possible to make *Tricreatine Malate* as malic acid is a dicarboxylic acid that has only two points of attachment. Thus, the Creative patent covers this so-called *Tricreatine Malate* as well.

It has also come to my attention that SAN Corporation has sent a number of threatening letters to the industry alleging that it also has received a Notice of Allowance of its patent application entitled *Creatine Salts and Method of Making Same*. These letters purport to put the industry on notice of infringement of the patent which, according to SAN, will soon issue.

Even if SAN is correct that a patent will issue from its application, the patent will not be enforceable because of your prior inventions and work.

I have reviewed the documents sent to me by you. These documents conclusively establish that your work on dicreatine substantially predates the SAN work. Thus, I do not believe that a patent issued to SAN on its application would be enforceable. In fact, had the Patent Office known of your earlier work, the SAN application would have been rejected on its face.

I will keep you posted of any further developments related to SAN. Should you have any questions in the interim, please do not hesitate to contact me.

Very truly yours,

Tom

Thomas L. Peterson

TLP/

**CERTIFICATE OF SERVICE**

This is to hereby certify that on this 15th day of October, 2007, I caused a true and correct copy of the forgoing First Amended Complaint to be filed electronically through this Court's ECF System and is available for viewing and downloading from this Court's ECF System.

Robert W. Ashbrook, Jr.
Dechert
2929 Arch Street
Cira Center
Philadelphia, PA 19104

Ury Fischer
Lott & Friedland, PA
355 Alhambra Circle
Suite 1100
Coral Gables, FL 33134

Counsel for defendant
Creative Compounds, Inc.

/s/ Frederick A. Tecce
**Frederick A. Tecce**